Counsel, you may proceed, and good morning to you. Good morning, Your Honors. Please, the court. Your Honors, my name is Danielle Claffey, and I'm appearing today on behalf of Mr. Martinez, the petitioner. Thank you. So Your Honors, we're here today for the case of a proceeding under the deferral of removal under the Convention Against Torture. Under this statute, it requires the petitioner to establish it would be more likely than not that he would be tortured if removed to Guatemala. Further, that torture must be inflicted by or at the instigation, or with the consent or acquiescence of a public official or the person acting in an official capacity. Of course, in July of 2018, the BIA dismissed the decision affirming the decision of the underlying immigration judge. Mr. Martinez argues here that the BIA's decision  Not only does he propose that he did, in fact, suffer past torture, which is an element of being able to establish more likely than not that he would suffer torture in the future, but that he also can separately establish the fact that he will, in fact, more likely than not suffer future torture if returned to Guatemala. The BIA, first, the BIA had affirmed the underlying judge's decision based on and specifically honing in on Cadet V. Bulger, 377 F. 3rd, 1173, from 2004 in the 11th Circuit. Specifically, that an act resulting in unanticipated or unintended severity of pain and suffering is not, in fact, torture. Mr. Martinez would counter-argue that an unintended result, meaning in this case the triggering of his hydrocephalus, which is the condition that he suffers from, and the need for emergency surgery to implant shunts in his brain in Guatemala does not, in and of itself, negate the act itself of being beaten with a pistol on one occasion, of passing out and leading to unconsciousness, which is what led to his emergency stay in the hospital and the emergency surgery on a separate occasion, that those instances in and of themselves are not only unintended consequences, even though they are consequences in and of themselves, but our argument is that it doesn't negate the acts themselves and that those acts themselves could still constitute torture in the past. So, furthermore, Your Honors, we also cited, too, in our brief, matter of GA-23- Let's talk about the facts as they were alleged and presented to the IJ and the BIA. Yes, Your Honor. As I understand it, and you help me if there's more to it, with respect to the petitioner, Martinez, there's a single incident where he said he was hit by the butt of a gun by the police. Correct. Then the second thing you cite, there's nothing else with regard to him. The second thing is you cite to his uncle's murder and the family's refusal to pay a tax to Moras, right? Correct, Your Honor. That's two and three. The fourth is that he suffers from a mental condition or the problem of hydrocephalus, and that emergency surgery left a physical scar and imprint of his shunts on his head, making him a target for future attacks. But the only incident, and help me if I misread the record, the only incident of alleged torture is the incident of being hit once by the butt of a gun by the police officers. There was, Your Honor, an incident that preceded what happened on that occasion, and it was actually the first incident that occurred immediately within two days of him returning to Guatemala. He ended up in Guatemala City because he had family members residing in Guatemala City, and in the record, it discusses the fact that two days after his return, he was in fact approached by members of the Moras in Zone 18, which is where they are very prevalent in that area of the city, and where he was first requested and strongly encouraged to make that payment. Right, but I'm simply, I'm asking the question of the only incident where he sustained any torture himself, what you allege to be torture, was the one incident by the butt of a gun by the police officer? That's correct, Your Honor, because he is unaware of who may have committed the act when he was on a bus when he lost consciousness, so that cannot be identified who those actors were in that circumstance. Well, tell me how we could possibly read, given our case law, the attack on the incident where he was hit in the head by the butt of a gun that constituted, why would that constitute torture? It may be outrageous, it may be actionable misconduct if it had occurred in the United States, but I'm hard-pressed to see how that would amount to torture under the CAT. Yes, Your Honor. Well, our position is that it's not only that act which can constitute the possibility, or the more likely than not standard, that he would suffer torture in the future, which could satisfy the requirement for a CAT claim. So we are not relying on only that incident in satisfying their- Right, but did you produce any evidence suggesting that he would be singled out and targeted upon return to Guatemala? In our briefing, Your Honor, we did highlight the reasons in our summary argument as to why we felt that on his return again to Guatemala, that he would, in fact, be singled out and be targeted. And what was that, because he had a shunt? Well, specifically, that would be one of the factors that he has two visible shunts in his brain. The fact that he had suffered incidences in the past where he was made contact with the madras also- But that's not action by the police or the state. Well, also, Your Honor, the circumstance where he was approached by the police officers with the incident with the butt of the gun by Zone 13 police officers in Plasencia, which is a suburb of Guatemala. So our argument is that taking all of those instances together, that that forms the basis under matter of GA, as well as Jean-Pierre- Let me ask the question this way. Is there any evidence that you presented, either generally or specifically, that the officers who attacked him, attacked him knowing that such an attack would cause him more pain than the average person? Did they know anything about his medical- Is there any evidence that they knew anything about his medical condition? There is no evidence that they knew anything about his medical condition because it also states clearly in the record that Mr. Martinez, in fact, was not aware of that condition at that time, that it was latent, but that some of the doctors believe that what had occurred, meaning assaults, had resulted in it triggering the hydrocephalus to the point where he began having fluids that were building up in his brain that resulted in the emergency surgery. So we stated clearly in the record that the police officers did not know, also primarily because Mr. Martinez was unaware of the medical condition at that time. But also, of course, part of our argument is the fact that it is well-known now that it's physically visible, and then upon his return, that would be one of the bases that, in the aggregate, could lead to the possibility that it's more likely than not that he, again, could be targeted for that reason. And again, Your Honor, we also cite, and I'd just like to briefly get into this, in matter of GA 23INN Decision 366, the BIA from 2002, the board in that case found that the evidence of the, quote, the evidence of the record when considered in the aggregate supports the more likely than not standard, meaning allowing for multiple factors to be taken wholly to constitute the possibility of meeting the more likely than not standard. So, and that's where we reference in our brief that in the instant case, he also, Mr. Martinez, also possesses these combination of factors substantiating that standard. And we go through all of the different factors, from the initial meeting with the Matas, leading in final to the fact that his uncle, the very individual who aided him in leaving the city to be able to reside with him in Plasencia, was killed, murdered only two weeks after his, Mr. Martinez's departure to the United States. And that's also documented in the record with his death certificate. And furthermore, to the fact that the immigration judge and the BIA did not make any different finding that Mr. Martinez, in fact, did testify credibly and in detail as to the circumstances each of these incidences that occurred to him in Guatemala. Finally, Your Honors, I also wanna point to the decision in Jean Pierre v. U.S. Attorney General, 500 F. 3rd, 1315, the 11th Circuit, 2007, is also on point in that the respondent, due to his specific unique medical conditions, was specifically susceptible to torture in a Haitian prison. That's what that case dismisses. Yeah, but I can tell you it was a different case. I wrote the opinion there. Yes, Your Honor. You had a case there where somebody was diagnosed as not only HIV positive, but actually was suffering from full-blown AIDS and was only kept alive because the University of Miami Medical Center gave him a regime of drugs that kept him alive. There was powerful evidence that was presented that if he were to go back to Haiti, the Haitians would treat him as a criminal on account of his status as being HIV positive and having AIDS and that he would be beaten around the ears with metal clubs and so on and so forth. On account of his AIDS, they wouldn't treat him, et cetera. Very, very, I mean, the evidence of torture just jumped off the page. Yes, I understand. You know, and the problem here is this is, all you really have is one incident where they hit him in the head with a barrel of a weapon. However wrong that may be, I'm having trouble seeing how that sustains a fair inference that if he's returned, that he's likely to be tortured by the police on round two. That's at least the problem that I'm having. Yes, Your Honor, and while I understand, I certainly understand the strength of the facts in that decision in Jean-Pierre. And I think the correlation that we are drawing from that case to Mr. Martinez here is the fact that it was written in that decision that it was a unique set of circumstances specific to Jean-Pierre that led to the finding that it was more likely than not that he would be subjected to torture. And so that's the correlation we're arguing in this case with Mr. Martinez is not necessarily honing in the specific facts, the mental incapacity and the HIV, AIDS and the medication, but the fact of those peculiar circumstances. While in Mr. Martinez, it may be the visual aspects of his medical condition, but those of themselves purport to show the argument and the basis that he himself also has a unique set of circumstances that would lead in the future in conjunction with issues that occurred in the past that would lead in the future to that meeting that more likely than not standard that he again could be targeted just as he was the first time, but again, even more so this time based on that perception and the view and the fact that now it is known that he does have something, that he does suffer from a medical condition. But again, that in conjunction with the other factors is our basis for arguing that it is more likely than not that he would suffer torture in the future in Guatemala. Thanks very much. Thank you, your honors. May it please the court. Jennifer Bowen on behalf of the respondent, United States Attorney General. In short, the record does not compel the reversal of the agency's denial of deferral under the Convention Against Torture here. The substantial record evidence supports the agency's decision that there was no past torture and that he did not demonstrate a probability of future torture. I believe the court has already addressed the evidence with respect to past torture. I'm happy to go into that if you would like, or I respondent can rest on his brief. I don't wanna take up the court's time. I leave it to you. We have no questions. Then your honors, I respectfully rest on the brief, which I believe addresses all of the issues. Thank you. Thank you. You have reserved three minutes, Ms. Claffey. You may use all of it or some of it or none of it, however the spirit moves you. Thank you, your honors. Of course, in light of the government's position, I will concede my remaining three minutes, your honor. Thank you very much. This court will be in recess until 9 a.m. tomorrow morning.